ARKANSAS MUTUAL FIRE INSURANCE COMPANY *v.* WITHAM.

Opinion delivered March 25, 1907.

1. REFORMATION OF INSTRUMENT—SUFFICIENCY OF EVIDENCE.—Reformation of a written instrument on account of an alleged mutual mistake will not be decreed unless the proofs of such mistake are full, clear and decisive.    (Page 234.)

2. FIRE INSURANCE—AUTHORITY OF ADJUSTER.—An insurance adjuster is authorized to waive proof of loss, though the bylaws of his company limit his authority to visiting the place of the loss and investigating and reporting the facts.    (Page 235.)

3. SAME—PROOF OF LOSS—WAIVER.—The fact that the insured and the insurance company signed a non-waiver contract did not preclude the insurance company from subsequently making an oral waiver of proof of loss.    (Page 235.)

4. SAME—WAIVER BY DENIAL OF LIABILITY.—By denying all liability under the policy an insurance company waives the proof of loss.    (Page 236.)

Appeal from Mississippi Chancery Court; *Edward D. Robertson,* Chancellor; affirmed.

STATEMENT BY THE COURT.

Appellant, in consideration of the sum of $16.50 paid by appellee as premium, issued its policy of fire insurance to appellee, insuring his dwelling house in the town of Leachville, Arkansas, "against all direct loss or damage by fire, lightning, tornadoes and cyclones." The policy was in a sum not exceeding $1,000 and of date December 5, 1903. Appellee sued appellant on this policy, alleging "that on the 25th of March, 1904, said dwelling house was completely destroyed by a cyclone or tornado." Other facts were duly set up in the complaint, stating a cause of action at law. Appellant set up as defenses: 1. That appellee was only insured against loss by fire, and that the provision in the policy insuring appellee against loss by cyclones was inserted through mistake. 2. That appellee failed to comply with the requirements of the policy as to proof of loss. Appellant prayed to have the policy reformed, and on its motion the cause was transferred to the chancery court. The decree of that court shows that "the cause was heard on the policy of said company and deposition of J. L. Witham and exhibits thereto, Mattie Vaughan and W. Satterwaite for plaintiff, and upon the depositions of J. T. Elrod, J. H. Manning, George Danaher, A. K. Collins, J. Carl, R. L. Smith, and exhibits thereto, and C. S. Collins with exhibits thereto, for the defendant."

The testimony for appellant on the question of the mistake in policy was substantially as follows:

J. T. Elrod was the agent of the appellant at the time he took appellee's application for insurance. No one was present when the application was taken except himself and appellee. Appellee wanted one thousand dollars insurance on his dwelling house. Witness took his rate book out of his pocket, and gave appellee the farmer's rate, told appellee that for fire, lightning, cyclone, and tornado it would cost $21.50 and for fire only $16.50; that appellee remarked, as well as witness could remember, "that they never had any storms in that country, and that he (appellee) did not care but for fire insurance." Witness would not "be *plumb* positive about" appellee's remark. Witness examined the application, and erased the words "lightning, tornadoes and cyclones" at the top. This was in appellee's presence. Witness

was of the impression that appellee did not read the application but very little, only possibly the written part. Witness made the indorsement on the application with an indelible pencil that night at the hotel; he did not notice the words "lightning and cyclones" in the indorsement until after the disaster. After the disaster witness received a letter from appellee asking witness to come over at once. Witness wrote appellee stating that witness was sorry for appellee's loss, "but sorrier that witness had only written appellee for fire insurance." Appellee never replied, but returned witness' letter. Witness kept a day book of applications, and when an application was for fire only he initialed it that way. He did that in order to keep up with his work and account with the company. Among other entries in his day book was that of "Leach & Witham, $30.00, $6.00." It was probably made at that time or a month later. About a month later he insured Leach and Witham's store for $1,000. About one week before the expiration of ninety days after the fire witness met appellee in Jonesboro, possibly in front of Watson's store. Appellee said the company had not settled. Witness told appellee the rates made him. Appellee then said: "You made me $13.50 and $16.50 rates for fire, lightning and cyclone." This brought up a dispute. Witness asked appellee if he did not remember witness drawing rate book, and showing appellee the rate at the time, and appellee said "Yes," and asked witness if he had one of the rate books with him. Witness showed appellee rate book. He looked through it, and said possibly he was mistaken, but his loss was so great and, the company making such a blunder, he thought he ought to have it, and that witness should help him get it. Witness told him he could not lean away from the truth to help him, and appellee said he could not blame witness. Manning was eight or ten feet away when this conversation took place. Witness Manning corroborated this witness as to the conversation between him and appellee at Jonesboro.

Witness Smith, an agent for the appellant, testified as follows: "In January, 1904, I wrote insurance on the plaintiff's household goods for fire only. The application was for fire, lightning, tornadoes and cyclones, but he only wanted fire, and I scratched out the cyclone and tornado clause in the application. He told me he already had insurance in the Arkansas on his

house, and I made him rates for fire, lightning and cyclone, and he told me I was charging too much. Then I gave him the rate for fire only. I don't think he stated as to the character of his policy in the other company. He said he was not much afraid of windstorms, and just preferred the fire. This was only a short while after he insured the house. I was expecting to get the house, but Elrod got ahead of me. I examined the application in this case. The erasures appear to have been written with a fountain pen.

George Danaher testified as follows: "I was in employ, at the time, of defendant as policy clerk. On the face of the application the words 'lightning, tornadoes and cyclones' were scratched out. I wrote the policy from the back of the application where it was not scratched out; hence by mistake inserted 'lightning, tornadoes and cyclones,' which I always do with a rubber stamp. I am not now in the employ of defendant."

A. K. Collins, cashier and assistant secretary of appellant, testified as follows: "The first thing that attracted my attention was a photograph of the house, which came with the application. It was unusual. The inside had 'lightning, tornadoes and cyclones' erased. The indorsement—not a part of the application proper—had these words not erased, and the rate $16.50, being the correct rate for fire only. It was approved for fire, and turned over to the policy clerk, Mr. Danaher. Our policies are issued in every case for fire only, unless the application calls for fire, lightning, tornadoes and cyclones, in which case an additional charge is required. Mr. Danaher in writing the policy had taken the description from the face, and had folded preparatory to filing it, and, discovering on the back the words 'lightning,' etc., were not erased, and, I presume, without opening to verify the facts, stamped on the face of the policy the words 'lightning, tornadoes and cyclones.' When we received the notice of the loss, that was examined, and we thought Mr. Witham must be in error, because the application did not call for cyclone. The error was not discovered until C. S. Collins called on Witham in person. I don't undertake to say I can remember every application, but I do know that we are particular about rates, and if Mr. Witham attempted to get insurance for fire, lightning and cyclones for the fire rate only, the application would have been

turned down, or Mr. Witham called on for additional charges. The application was filed as it reached the office, and was not opened until after Mr. Witham notified us of his misfortune.

Frank Carl, the president, and chairman of committee to examine the applications sent in by agents, testified: "On December 5, 1904, I passed on and approved this application. The circumstances of this particular case were fixed on my memory by the unusual circumstance that it was accompanied by a photo of the house. Mr. Witham's application is before me. It is in the same condition as when I approved it, when it came by mail to my office. The words 'lightning, tornadoes and cyclones' are erased with a pen, and the amount indorsed on the back, as premium, is correct according to the rate book. If the clerk prepared it otherwise, it was a mistake."

C. S. Collins's testimony tended to show that the application of appellee for insurance was for fire insurance only. He explains how this was; shows that it was the universal custom to erase the words 'lightning, tornadoes and cyclones' where only fire insurance is wanted, as was done in this instance; shows that the rate charged in this case was $16.50, and that if the erasures mentioned had not been made the application would have been rejected because the rate for lightning, tornadoes, and cyclones, as well as fire, was $21.50 per $1,000 of insurance, instead of $16.50. This witness explains the various steps he took in the way of writing letters to appellee and visiting him for the purpose of ascertaining whether a mistake had actually been made in writing the policy. He explains the various steps taken to ascertain the facts under a non-waiver agreement, and as a conclusion of the whole matter testifies that, having decided on investigation "that Elrod was supported by all the surrounding circumstances and contemporaneous facts, and by the appellant's record, he, for appellant, denied liability not only on account of the mistake but on account of failure of appellee to file proof of loss in sixty days. This witness stated that he made no promise to appellee that he would get his money in thirty days. Witness stated that under the by-laws of a mutual company, which appellant was, witness had no authority to make any such promise to appellee. It would have been impossible for witness to have made such promise because, the witness explains, "the question

as to whether a mistake had not been made was up and had not been determined one way or another. Witness says that appellee understood that appellant had not either admitted or denied liability. Witness denied that he led appellee to believe that he (witness) had full power to settle and would do so at once. Witness says appellee "was part of the company, and was practically on same footing" as witness. A non-waiver agreement dated April 6, 1904, signed by appellant and appellee, is made part of the record. The various letters that were made exhibits and read in evidence it is not necessary to set forth.

Appellant's by-laws contain this section:

"Section 13. It is directed that in all settlements for losses, the representative or adjuster of the company shall be limited in authority to visiting the place of the loss and investigating and reporting the facts; the board reserving to itself the authority of determining questions as to liability and the amount of the same."

The policy was of standard form, and contained a sixty-day proof-of-loss clause, with which appellee did not comply. This was the case for appellant.

On behalf of appellee, Witham testified that he was the owner of the property; that Elrod, the agent of the appellant, came to see him about taking out insurance; that he agreed to take insurance against fire, lightning, tornadoes and cyclones; that the rate was $13 for fire for a year, and $16.50, fire, lightning, tornadoes and cyclones; that he took the entire risks; that he informed Elrod that he desired to do so; that he paid the premium demanded for these risks, and received a policy covering the risks applied for; that he has since examined the application which he signed, and the words "lightning, tornadoes and cyclones" have been erased; that this application was signed in December, 1903, and in March, 1904, his building was totally destroyed by a cyclone; that it cost $1,500 to build it; that it was completely destroyed by the storm; that after its destruction he wrote Elrod, the agent, who replied that he had nothing to do with it, and for him to notify the company, and further that he hardly thought he had written him for cyclone risk; that he then notified Mr. C. S. Collins, wrote him two letters; that Mr. Collins came; that he signed a non-waiver agreement, and then made a statement to Mr. Collins, which appears as exhibit four

to the deposition of Mr. Collins. That after he made this proof of loss, which was made after the signing of the non-waiver agreement, he asked Mr. Collins if additional proof of loss was necessary. These are his statements: Q. "State if anything was said about any additional proof of loss being made?" A. "Well, after he had taken that proof there, I asked him if it was necessary for me to make any further proof, and he said that it was not; that that paper there would be sufficient; that he would place that before the company when he went back, and the matter would be adjusted in the course of a few weeks. I understood it that way." Q. "State what, if anything, was said to you by Mr. Collins about the adjusting of your loss." A. "Well, he told me there was no necessity of making further proof, that he had been there on the ground and examined the property, and that his being there on the ground and estimating the loss was sufficient." That he would have made any additional proof of loss, had he known it was required of him; that he never at any time tried to induce Elrod to testify in his behalf; that no conversation occurred between him and Elrod looking to that end; that afterwards the company notified him that it demanded the names of witnesses who could contradict Elrod, and that some correspondence ensued, and he furnished it the names and affidavits of his wife and Miss Mattie Vaughan; that Miss Vaughan and his wife were present when the application for the policy was signed, and could, and did, hear the contract between Elrod and himself; that the building in which the application was prepared was the store and postoffice; that the rate book showed when examined by him and Elrod a $16.50 rate for the risk that he applied for and obtained; that he did not know J. H. Manning; that a conversation between him and Elrod occurred in front of Watson's store and across the street from Ad Jones' saloon; that was the only time he understood that the company had disputed that he had made sufficient proof of loss; that he wrote immediately and asked about it, and it made no reply to that part of his letter; that no disclaimer of the fact that he had made full and sufficient proof of loss was made by the company until after the expiration of the time in which the company claimed proof of loss could be made.

Mattie Vaughan says that she is a sister-in-law of the ap-

pellee; that she was present and heard the conversation between Elrod, the agent of appellant, and Witham, the appellee, regarding the insurance in controversy; that she heard the agreement; that Elrod and Witham agreed that Witham should have insurance on his dwelling against loss by fire, lightning, tornadoes and cyclones; that she was within ten feet of the parties, and distinctly heard this agreement, and that upon this agreement and application there made out this policy in controversy was issued; that she had heard no other application for insurance before or since this time.

W. Satterthwait testified that he lived at Leachville at the time the policy herein sued upon was issued; that he knew T. J. Elrod and J. L. Witham; that Elrod came immediately from Witham's store to his place and wanted to insure his house; that he told him the building did not belong to him; then Elrod wanted to issue a policy on his furniture and told him that he had just insured Witham's dwelling against loss by fire, lightning, tornadoes and cyclones; that he told him this in urging him, Satterthwait, to take a policy of the same kind on his furniture.

The chancellor found against appellant on both its defenses, and entered a decree in favor of appellee for the sum of $1,080, the amount of the policy, and interest to date of decree.

Appellant prosecutes this appeal.

*N. F. Lamb* and *C. S. Collins,* for appellant.

1.   If the finding of facts by the chancellor is contrary to the weight of the evidence, this court will review the evidence and determine the facts for itself.   41 Ark. 111; 72 Ark. 67.

2.   The court erred in ignoring section 13 of the by-laws of the company.   The by-laws are referred to in the policy, are a part of the contract, and are binding, in every mutual company, upon its members, the policy holders.   64 Neb. 808; 2 Cooley's Briefs on Ins. 1439; 9 Metc. (Mass) 205; 7 Cush. (Mass.) 175; 33 N. H. 9.   "The by-laws of a mutual company may fairly be regarded as a part of the contract, so as to be continuing warranty."   2 Cooley's Briefs on Ins. 1476; 11 Ia. 21; 113 Mich. 158; Richards on Ins. 76; 133 Mass. 85; 14 Gray, 203; 81 Am. Dec. 689; 1 Beasley, 333; 65 N. Y. 21.

3.  If the adjuster made the statement attributed to him by the plaintiff, it was without consideration, and was recalled in writing within twenty-four hours on the return of the adjuster to the home office. He had not acted upon the adjuster's statement, was put to no expense thereby, was not misled.    53 Ark. 494, 502; 94 S. W. 787, and cases cited.

*T. H. Caraway,* for appellee.

1.  The testimony supports the finding of the chancellor. This court will not reverse the findings of a chancellor unless there is a clear preponderance of the evidence against the decree. 72 Ark. 67.

2.  Before a court will decree a reformation of a written instrument, the evidence must be clear and decisive. The evidence must be such as to leave no reasonable doubt upon the mind of the court. 20 Wall. 488, 22 Law. Ed. 494. And the mistake must be mutual. It must appear that both have done what neither intended. *Ib.* "When a repugnancy exists between a typewritten rider on the policy and the printed parts thereof, the provisions of the writing will prevail." 35 Atl. 75.

3.  There is nothing in the by-law insisted upon by appellant that deprives the adjuster of the power to waive proof of loss, or to accept certain statements as sufficient proof of loss. He had that power. 61 Ark. 108; 62 Ark. 348. Waiver of a forfeiture can not be withdrawn. 53 Ark. 494. Consideration for a waiver is not required. 80 N. Y. 108.

WOOD, J. (after stating the facts.)    1.  Appellee has a policy insuring his dwelling against loss by "fire, lightning, tornadoes and cyclones." He showed that he sustained a total loss by tornadoes, and that the appellant denied liability for such loss. This established *prima facie* the liability of appellant. The burden was then upon appellant to show that the policy did not in fact cover loss from tornado, and that the failure to erase the word "tornado" from the policy, or the insertion of that word, was a mistake which neither appellant nor appellee intended. The rule by which reformation is or is not effected is as follows: "In no case will the court decree an alteration in the terms of a duly executed written contract unless the proofs are full, clear and decisive. Mere preponderance of evidence is not enough.

The mistake must appear beyond reasonable controversy." Bish. on Contracts, § 708; *Davenport* v. *Hudspeth,* 81 Ark. 166; *Foster* v. *Beidler,* 70 Ark. 418; *Tillar* v. *Wilson,* 79 Ark. 256; *Goerke* v. *Rodgers,* 75 Ark. 72; *McGuigan* v. *Gaines,* 71 Ark. 614. See also *Hearne* v. *Marine Ins. Co.,* 20 Wall. 488. As to whether or not appellee applied to appellant's agent, Elrod, for insurance against loss by tornado is a matter of sharp conflict between them. But appellee's testimony to the effect that he did apply for such insurance is corroborated by the testimony of two witnesses, while Elrod, the agent, testified that there was no one present but him and the appellee when the application was made out and signed. True, the witnesses in the office where the application was sent leave no room to doubt that the application reached the office with the words "lightning, tornadoes and cyclones" erased from its face. But this application was sent in by Elrod, and the pivotal question still remains as to whether the policy that was issued to appellee conformed to the application that appellee made for insurance, and not the application that Elrod sent in. Elrod was in charge of the application after it was signed by appellee. The preponderance of the evidence is certainly not clearly against the chancellor's finding that the policy was issued in accordance with the application for insurance which appellee actually made and signed, and not that which was turned in by appellant's agent. That is the crucial point of inquiry, and under the rule announced *supra* appellant was not entitled to reformation.

2. There is nothing in the section of the by-laws of appellant, relied upon, to deprive its adjuster of the authority to waive proof of loss. He had that power. *German Ins. Co.* v. *Gibson,* 53 Ark. 494. Indeed, the testimony of C. S. Collins shows that he had something more than the power of the ordinary adjuster. He assumed and exercised the power of denying liability for the company. We can not say that the finding of the chancellor that appellant waived proof of loss was against the clear preponderance of the evidence. The fact that appellant and appellee signed a non-waiver agreement did not preclude appellant from orally waiving proof of loss. See *Burlington Ins. Co.* v. *Kennerly,* 60 Ark. 532; *Burlington Ins. Co.* v. *Lowery,* 61 Ark. 108; *German-American Ins. Co.* v. *Humphrey,* 62 Ark. 348.

But, since appellant denies all liability because of the alleged invalidity of the policy as to tornado insurance, the proof of loss was thereby waived. *German Ins. Co.* v. *Gibson,* 53 Ark. 494-501.

Decree affirmed.